## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Anthony Lietzow,

        Plaintiff,

v.

Village of Huntley, et al.,

        Defendants.

No. 17 CV 05291

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Lietzow brings this civil rights action pursuant to 42 U.S.C. § 1983 and Illinois state law against Defendants, the Village of Huntley ("Village") and Huntley Police Officers James Daley, Alex Panvino, and David Sander ("Defendant Officers" or "the Officers"). Plaintiff alleges that on July 19, 2015, Defendant Officers wrongfully entered his home and arrested him without probable cause in violation of his Fourth Amendment rights. (Dkt. 43.)[1] Plaintiff brings claims for false arrest and failure to intervene to prevent a false arrest (Count I), illegal pre-trial detention (Count II), malicious prosecution under Illinois state law (Count III), illegal search and seizure (Count IV), and indemnification against the Village (Count V). Pending before the Court is Defendants' motion for summary judgment. (Dkt. 95.) For the reasons stated in this opinion, Defendants' motion is granted in part. The Court enters summary judgment in Defendants' favor as to Counts I, II, and IV. As to the remaining state law claims for malicious prosecution (Count III) and indemnification against the Village (Count V), the Court declines to exercise supplemental jurisdiction over these claims. The case is therefore dismissed.

---

[1] In citations to the docket, page numbers are taken from the CM/ECF header, except when the Court cites to deposition testimony, in which case the Court cites to the internal transcript page and line number.

## Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine issues of material fact are not demonstrated by the "mere existence of some alleged factual dispute between the parties," *id.* at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "[t]he controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016). Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carrol v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

In resolving a motion for summary judgment, the Court construes all evidence and draws all reasonable inferences in the non-movant's favor. *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010). However, the Court makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (the nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture").

2

**Background**

Because this case is before the Court on summary judgment, the factual record is framed largely by the parties' Local Rule 56.1 statements and responses, (Dkts. 97, 100, 101, 103), although the Court retains discretion to "consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3).  Before the Court sets forth that background, a few preliminary comments are warranted about the requirements of Local Rule 56.1 and the standards for evaluating audio evidence at summary judgment, given the presence of recordings in the record. The Court will also address the parties' disputes over some of the exhibits that Plaintiff attached to his Rule 56.1 statement.

**A.  Local Rule 56.1 Statements and Evaluation of Audio Evidence**

Northern District of Illinois Local Rule 56.1 prescribes the format that summary judgment proceedings must take. Under the rule, the party seeking summary judgment must include with its motion "a statement of material facts," and each asserted fact "must be supported by citation to the specific evidentiary material . . . that supports it." L.R. 56.1(a)(2), (d)(2). The Court may "disregard any asserted fact that is not supported with such a citation." L.R. 56.1(d)(2). The non-movant then files a response to the movant's statement of material facts, in which the non-movant must admit or dispute the asserted fact, or admit in part and dispute in part. L.R. 56.1(e)(2). Notably, in order to dispute an asserted fact, a party "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact [and] [a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3); *see also Cracco v. Vitran Express, Inc*., 559 F.3d 625, 632 (7th Cir. 2009) (failure to dispute facts in the manner required by local rules allows the court to conclude "those facts are deemed admitted for purposes of the motion"). The non-movant may

also add additional undisputed facts in response, to which the movant may reply. L.R. 56.1(b)(3), (c)(2). The requirement that asserted facts, or any disputing of facts, be supported with specific citations to evidentiary material applies to these statements of additional facts by the non-movant and any reply by the movant. L.R. 56.1(e)(2)–(3).

Regarding evaluation of audio evidence, the Court need not accept either party's representations of particular facts in their Local Rule 56.1 statements if those facts are clearly contradicted by audio recordings. *See generally Agnew v. Cater*, No. 3:18-CV-50035, 2022 WL 540763, at *7 (N.D. Ill. Feb. 23, 2022) ("[C]ourts consider the video and audio evidence without favoring the nonmovant. . . . And, not surprisingly, this principle works on the flipside. So, when audio or video recordings contradict a movant's factual representation, the recording trumps the representation.") (collecting cases). The Court thus may independently evaluate any audio evidence to determine if it clearly contradicts, or on the other hand, clearly supports, one party's presentation of the facts over the other's.

Finally, the Court notes that it possesses broad discretion to "require strict compliance with Local Rule 56.1," *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015), and where a party has failed to follow the rules, the Court is not required to "scour the record looking for factual disputes." *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015).

**B. Scope of the Record and Plaintiff's Additional Exhibits**

As part of his response to Defendants' statement of material facts, and in support of his own statement of additional facts, Plaintiff attaches and refers to several exhibits on top of those attached to Defendants' opening statement of facts. In particular, Plaintiff attaches his criminal complaint (Exhibit K) and underlying bill of indictment (Exhibit L), transcripts of trial testimony from his underlying criminal trial (Exhibits M and N), a supplemental police report from Officer

Sander (Exhibit O),[2] and a written witness statement (Exhibit P). (Dkt. 100 at 2–3.)

In their reply statement, Defendants objected to Plaintiff's additional exhibits on a number of grounds, including that Plaintiff had not laid the foundation for the documents, the documents were not self-authenticating, and the documents constituted hearsay to which no exception applies. (Dkt. 103 at 2–4.) Defendants further objected that the trial transcripts should not be considered, because Plaintiff had not established that the witnesses were "unavailable" and the witnesses' testimony from other proceedings could not be utilized in lieu of testimony in these proceedings pursuant to Federal Rule of Civil Procedure 32(a)(4). Plaintiff responded by moving the Court to take judicial notice of Plaintiff's criminal complaint and bill of indictment, which the Court granted (Dkt. 107, 111), and for leave to file a sur-reply addressing Defendants' arguments with respect to the other exhibits, which the Court also granted.  (Dkts. 106, 108.)

Regarding transcripts of trial testimony from Plaintiff's underlying criminal case (Exhibits M and N), it is well settled that sworn testimony may be considered in support of or opposition to a motion for summary judgment. (Dkt. 109 at 2–3.) Courts may rely on sworn testimony given in prior judicial proceedings in resolving summary judgment motions, even if the testimony is offered for the truth of the matter asserted and would otherwise be considered hearsay. *See Kalpedis v. City of Peoria*, No. 10-CV-1142, 2013 WL 12374682, at *2 n.2 (C.D. Ill. Jan. 31, 2013) ("[S]uch testimony will be taken to reflect that to which the declarant would testify at a trial in this matter.") (citing *Williams v. Vasquez*, 62 F. App'x 686, 692 (7th Cir. 2003) ("[A]long with other courts, we have recognized that transcripts of testimony may be considered in support of, or opposition to, a motion for summary judgment.")); *see also Askew v. Bloemker,* 548 F.2d 673, 679 (7th Cir. 1976) ("[T]he record before us contains voluminous material cognizable on a motion for summary

---

[2] Plaintiff describes the exhibit as a statement from Officer Panvino, but the report itself suggests it was made by Officer Sander. (Dkt. 101-1 at 92.)

judgment, including numerous depositions and some transcripts from the criminal trial at which defendants were previously acquitted of violating the civil rights of the Askews and other citizens."). Plaintiff has attached the cover pages and court reporter certifications for the transcripts, and Defendants have not disputed that the transcripts are what Plaintiff purports them to be. The Court thus consider the witnesses' sworn testimony as reflected in the transcripts for the purposes of summary judgment.

Finally, regarding the supplemental police report from Officer Sander (Exhibit O), and a written witness statement that was included in the police report (Exhibit P), Plaintiff concedes in his sur-reply that the exhibits "are not part of the Plaintiff's criminal file and therefore may not be admissible in their entirety." (Dkt. 109 at 2–3.) Plaintiff argues, however, that Federal Rule of Evidence 803 allows for, as an exception to the hearsay rules, the admission of information a police officer observed and recorded in his police report. *Id.* The Seventh Circuit has recognized that police reports, though generally excluded from consideration under hearsay rules, are allowed under the public records exception to the extent they incorporate firsthand observations of the officer. *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). The witness's statement (Exhibit P), however, does not contain any officer impressions and merely seems to recite a third party's account, which would not place the statement into the hearsay exception allowing for evidence showing an officer's own firsthand observations. *Id.* ("[T]hird-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility."). While the supplemental report of Officer Sander (Exhibit O) would seem to fit that definition, Defendants argue that Plaintiff has not referenced any affidavit or testimonial evidence laying the foundation for or authenticating the report. Yet, Defendants do not claim the report is not authentic or that it is not, in fact, Officer

Sander's report. Indeed, the report bears bates numbers with the "Huntley" prefix, suggesting that Defendants produced the report in discovery. Further, while evidence must be admissible at trial to be considered at summary judgment, "the form produced need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017). Officer Sander's testimony about his first-hand impressions would plainly be admissible at trial.

The Court ultimately finds that Exhibit P, the supplemental witness statement, is hearsay and should be excluded from consideration at least to the extent it is offered for the truth of the matter asserted. Regarding the supplemental report of Officer Sander, summary judgment would be proper in Defendants' favor irrespective of whether the Court considers the exhibit. The Court will consider it to the extent it reflects Officer Sander's firsthand observations.

## C. Factual Background

Except as otherwise noted below, the following represents the undisputed facts as presented in the parties' Local Rule 56.1 statements.[3] Where the facts are disputed, the Court has indicated each side's position.

Plaintiff Anthony Lietzow is a Mount Prospect Police Officer and has been an officer since March 2004. (Dkt. 103 ¶ 1.) At the time of the incident at issue here, Plaintiff lived in Huntley, Illinois, with his wife Kimberly and their children. (Dkt. 100 ¶ 11.) Plaintiff and Kimberly lived at House 264, and their next-door neighbors were Kent and Michelle Beam, who lived at House 284. *Id.*[4]

At 4:33 a.m. on July 19, 2015, Michelle Beam made a 911 call to report a disturbance involving her next-door neighbor, Kimberly. (Dkt. 100 ¶ 12.) On the call, the recording of which

---

[3] The Court cites in particular Plaintiff's response to Defendants' statement of facts, (Dkt. 100), and Defendants' response to Plaintiff's statement of additional facts, (Dkt. 103), where both the asserted facts and the opposing party's responses are set forth in one document.

[4] The parties agreed to refer to the residences by partial house number.

was submitted to the Court, Ms. Beam told the 911 dispatcher that the incident involved Kimberly and her husband, later identified as Plaintiff, and that supposedly Plaintiff and Kimberly had a fight. (Dkt. 97-8.) Ms. Beam told the dispatcher that she "believe[s]" Plaintiff tried to strangle Kimberly, because she was holding her throat. *Id.* Ms. Beam then indicated that Kimberly was with the Beams at their house, and the dispatcher asked if Kimberly was injured. *Id.* Ms. Beam responded by stating that Kimberly was "crying" and that "he tried to choke her," but also added that Kimberly did not need an ambulance and was breathing fine. *Id.* The dispatcher then asked Ms. Beam several more questions about where Plaintiff was, what he was wearing, and whether he had a weapon, and Ms. Beam can be heard repeating several of those questions to Kimberly and then relaying the answers back to the dispatcher. *Id.* Ms. Beam also relayed to the dispatcher that Plaintiff was a Mount Prospect police officer. *Id.* Eventually, the dispatcher asked to speak to Kimberly directly, and confirmed with her that she did not need an ambulance. *Id.* Kimberly also relayed to the dispatcher that Plaintiff was intoxicated and that she, Plaintiff, and another couple had been out earlier in the evening, but that Plaintiff had left with the other male when he got very upset about something that had happened. *Id.*

Defendant Officers were working patrol in Huntley at the time, and after the 911 call came in, they were dispatched to respond to the domestic violence incident reported in the 911 call. (Dkt. 100 ¶ 13.) The Court has also been provided a recording of the dispatch call between the 911 dispatcher and Defendant Officers. (Dkt. 97-9.) As Defendant Officers were en route, the dispatcher advised them that a neighbor was calling 911 on behalf of a victim, that the victim had been strangled by her husband, and that her husband was a police officer and was intoxicated. (Dkt. 100 ¶ 14.) The dispatcher further relayed that the 911 caller had a "language barrier," that the Plaintiff would be "lingering around" somewhere, and that the victim was at the neighbor's

house.[5] (Dkt. 103 ¶ 11.)

Plaintiff denies that Kimberly ever told the Beams that Plaintiff tried to choke her, and disputes that any domestic violence incident ever occurred. (Dkt. 100 ¶¶ 12, 14; Dkt. 103 ¶¶ 7, 38). Instead, according to Plaintiff, he locked Kimberly out of their house after their earlier argument, and Kimberly went to the Beams to ask them to dial 911 for assistance getting into her house, not for any domestic violence incident. *Id.* As discussed further below, even accepting as true Plaintiff's claim that Kimberly did not tell the Beams that Plaintiff tried to choke her, it is undisputed, and indeed irrefutable on the audio tapes, that Ms. Beam told 911 more than once that Plaintiff tried to "choke" or "strangle" Kimberly. (Dkt. 97-8 at approx. 1:55, 3:08.) It is further undisputed, and plain on the audio recording, that the 911 dispatcher told Defendant Officers that Plaintiff "tried to strangle her [Kimberly] . . . .it's going to be a domestic battery" (Dkt. 97-9 at approx. 1:16.)

Officer Daley was the first to arrive at the scene. He went to the Beams' house and spoke with them as Kimberly was still on the phone with 911. (Dkt. 100 ¶ 15.) Shortly after, an officer can be heard asking the dispatcher to end the call with Kimberly so that they can speak with her. (Dkt. 97-9.) When Kimberly got off the phone with 911, she spoke with Officer Daley. Another officer, Defendant Officer Sander, arrived shortly after and participated in some of the conversations with Kimberly. (Dkt. 100 ¶ 15.)

Kimberly told Officer Daley that she had been out at a bar with her husband and another husband-and-wife couple earlier in the evening. (Dkt. 100 ¶ 16.) Kimberly told Officer Daley that she and Plaintiff argued and left the bar separately, and further told the Officer that while driving home from the bar, Plaintiff chased the car in which she was riding and tried to run the car

---

[5] Upon listening to the audio recording of the 911 call, the Court did not discern a "language barrier" on the part of Ms. Beam, who answered the dispatcher's questions appropriately, though with a slight accent, presumably British.

off the road. *Id.* Kimberly further told Officer Daley that after she was dropped off by a male friend up the street and began walking toward her home, she was confronted by Plaintiff, who yelled at her and "put his hands around her neck and squeezed causing [her] to choke and be unable to breathe." *Id.* ¶ 17. While Officer Daley was speaking with Kimberly, he observed she was "very upset," was "having a hard time breathing," coughed a lot, and her voice was "rough and raspy." *Id.* ¶ 18. Officer Panvino was present for part of the conversation and testified that he heard Kimberly tell Officer Daley about her argument with Plaintiff and that Plaintiff had tried to choke her. (*Id.* ¶ 20; Dkt. 97-6 at 16:9–17:4.)

The Court again notes that Plaintiff vigorously disputes what Kimberly actually said to Officer Daley, but without any cited evidentiary support to create a genuine issue of fact. It is undisputed that Kimberly reported to Officer Daley that she had been out that night with Plaintiff and another couple, and that she and her husband had left separately after an argument. But Plaintiff denies that Kimberly told Officer Daley that: (1) he tried to run Kimberly's car off the road; (2) she was confronted by Plaintiff; and (3) Plaintiff was violent toward her and tried to choke her. (Dkt. 100 ¶¶ 16–17.) It is undisputed that Kimberly was upset, was coughing, and had a raspy voice, but Plaintiff suggests that this was because she was upset that she was locked out of her house. However, while Plaintiff disputes what Kimberly said to Officer Daley, the evidence he cites from his and Kimberly's deposition testimony does not directly contradict Defendants' evidence as to what Kimberly told Officer Daley. Rather, the evidence Plaintiff cites relates to his and Kimberly's description of what happened prior to officers arriving that evening, and what Kimberly maintains she did, or did not, tell the Beams. Thus, as will be discussed further below, Plaintiff has not cited evidence creating a genuine dispute as to what Kimberly reported to the Officers.

As Officer Daley was speaking with Kimberly, Officers Sander and Panvino went to the Lietzow home to try to make contact with Plaintiff. (Dkt. 100 ¶ 19.) They knocked on the door and rang the doorbell, but no one answered. *Id*. The Officers then returned to Kimberly, and the parties again dispute what exactly was said next.

According to Defendants, the Officers asked Kimberly to let them into her house so they could speak with Plaintiff, to which she agreed. *Id*. ¶ 20. Defendants state that the Officers and Kimberly walked to the garage door, Kimberly entered the code on the garage security pad, and the door opened. *Id*. ¶ 21. Defendants further state that Kimberly told the Officers they could enter the home, but that she did not want to. *Id*. Plaintiff, on the other hand, agrees that Kimberly walked to the garage and entered the code for the door to open, but denies that the Officers explicitly asked Kimberly to enter the home, and denies that Kimberly agreed to allow the Officers to enter the home. *Id*. ¶¶ 20–21. Plaintiff also suggests that the Officers "insisted" that she open the garage door, and that they "stood over her" while she attempted to open the door. (Dkt. 103 ¶¶ 19–22.)

Once again, however, the record evidence does not entirely support Plaintiff's presentation of the facts. In particular, while Kimberly testified that Defendants "kept asking her" to try to open the garage, she never specifically testified that they "stood over her" while she tried the code. (Dkt. 97-4 at 40:8–41:21.) Further, Kimberly testified that she responded "yeah" and "okay" to statements from the Officers that they intended to go talk to Plaintiff, though she also later testified that she "thought" they just meant they were going to enter the garage and ask Plaintiff to come out. *Id*. at 41:22–42:19, 47:14–48:5.

After Kimberly opened the garage door, the Officers went into the garage and made their way to the interior door that gave access to the house. (Dkt. 100 ¶ 22.) Once again, the parties dispute what transpired over the next few seconds. According to Defendants, Officer Daley

11

knocked on the door, which was unlocked, and then proceeded to open the door and yell, "Huntley police." *Id.* ¶ 23. Defendants assert that, when there was no response, Defendant Officers began to enter the home, but nearly immediately, Plaintiff came charging at the Officers, yelling for them to get out of his house and using profanity. *Id.* ¶ 24. Defendants further maintain that the Officers announced that Kimberly said they could enter, but that Plaintiff grabbed Officer Daley's shoulder and pushed him, and when Officer Daley pushed back, Plaintiff grabbed his arm. *Id.* ¶ 25. Defendants claim that eventually, Plaintiff was pushed back into the house into the kitchen, and that the Officers tried to explain to Plaintiff that they needed to speak to him about the domestic violence complaint and that he was under arrest for battery of a police officer. *Id.* ¶ 26. Eventually, after initially refusing to comply, Plaintiff was handcuffed and arrested. *Id.* ¶ 27.

Plaintiff denies that the Officers announced themselves before entering the home and denies he grabbed Officer Daley. *Id.* ¶¶ 24–26. According to Plaintiff, he heard the garage door open and went to lock the interior door to the house that leads to the garage. (Dkt. 103 ¶ 25.) Plaintiff maintains that the Officers began opening the interior door and attempting to enter the home without identifying themselves as police officers, and so Plaintiff attempted to shut the door on the unknown individuals and told them to get out of his house. *Id.* ¶¶ 26–27. Plaintiff claims he lost the brief struggle and was pushed back away from the door towards the kitchen, and he maintains that it was only after he was being pushed back into the kitchen that he first realized the "intruders" were police officers. *Id.* ¶¶ 26–32.

Plaintiff was arrested and booked at the Huntley Police Department and charged with four offenses: resisting a police officer, aggravated battery, aggravated domestic battery, and domestic battery. (Dkt. 100 ¶ 28.) A grand jury later returned an indictment for those same four charges. (Dkt. 103 ¶¶ 40–42.) After a jury trial, Plaintiff was acquitted. (Dkt. 100 ¶ 29.) Plaintiff and

Kimberly maintain that no domestic violence incident as alleged by Defendants ever occurred. (Dkt. 103 ¶ 38.)

Based on the above facts, Plaintiff has brought several counts against Defendant Officers and the Village for alleged violations of his civil rights. In particular, Plaintiff brings claims for false arrest and failure to intervene to prevent a false arrest (Count I), illegal pre-trial detention (Count II), malicious prosecution under Illinois state law (Count III), illegal search and seizure (Count IV), and indemnification against the Village (Count V). (Dkt. 43.)

### Discussion

Defendants move for summary judgment on all of Plaintiff's claims. As to Plaintiff's claims for false arrest, illegal pre-trial detention, and malicious prosecution, Defendants argue that the Officers had probable cause to arrest, detain, and prosecute Plaintiff, which would be an absolute defense to those claims. Alternatively, Defendants argue the Officers are entitled to qualified immunity, because they had arguable probable cause to arrest and detain Plaintiff. As to the illegal search and seizure claim, Defendants argue that the Officers had valid consent from Plaintiff's wife, Kimberly, to enter Plaintiff's home. Defendants further argue the indemnification claim against the Village must fail because all the underlying claims fail. Alternatively, to the extent the Court rules only on qualified immunity grounds and thus the state law malicious prosecution and indemnification claims remain, Defendants argue that the Court should decline to exercise its supplemental jurisdiction over those state law claims.

The Court will address each of Plaintiff's claims, and the arguments for and against summary judgment, below. For the reasons discussed in this opinion, the Court rules as follows: (1) there is no genuine dispute of material fact that Defendant Officers had an objectively reasonable basis to believe Kimberly consented for them to enter her and Plaintiff's home, which

supports summary judgment in Defendants' favor on Plaintiff's claim for unlawful search and seizure; (2) there is no genuine dispute of material fact that the Officers had probable cause to arrest Plaintiff for domestic battery and aggravated domestic battery, which defeats his claims for false arrest, unlawful detention, and malicious prosecution for those charges as a matter of law; (3) the finding of probable cause to arrest on one charge also defeats Plaintiff's claims for false arrest and unlawful detention on the basis of the resisting arrest and battery of a police officer charges; and (4) to the extent Plaintiff may be able to separately maintain a cause of action for state-law malicious prosecution and indemnification for the resisting arrest and battery of a police officer charges, the Court declines to exercise supplemental jurisdiction over those state law claims in the absence of any remaining federal causes of action.

## A. Count IV: Illegal search and seizure

The Court begins with Plaintiff's illegal search and seizure claim, as it involves facts and legal issues that are distinct from the other claims. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protection of the Fourth Amendment is greatest when a search relates to an individual's home. *See Micklevitz v. Chapman*, No. 16-CV-905, 2021 WL 1250304, at *5 (E.D. Wis. Apr. 5, 2021) ("Among those places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection.") (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)); *see also United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."). As such, law enforcement is generally prohibited from searching inside a home without a warrant, and a

14

warrantless search is presumptively "unreasonable" under the Fourth Amendment. *Payton*, 445 U.S. at 586.

There are, however, certain exceptions to the general prohibition against warrantless entry into a person's home, and that includes when officers have obtained voluntary consent "either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted); *Wonsey v. City of Chicago*, 940 F.3d 394, 399 (7th Cir. 2019). "In a § 1983 case, once the defendant presents evidence that the plaintiff consented to the search, the burden shifts to the plaintiff to establish the lack of consent to search." *Wonsey*, 940 F.3d at 399 (citing *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997)).

Defendants claim it is undisputed that Kimberly had common authority over her and Plaintiff's home, opened the home's garage door to let the Officers into the home, and told Officers they could enter the home. (Dkt. 96 at 4–5.) Defendants argue that, based on these undisputed facts, Kimberly gave the Officers valid and voluntary consent to enter the home, thus making their entry reasonable under the Fourth Amendment. *Id.*

Plaintiff argues the Officers did not have consent, because the issue of whether Kimberly voluntarily agreed for them to enter the home is in dispute. (Dkt. 102 at 6.) In particular, Plaintiff argues that Kimberly "did what she was told to do" after Officers announced they were going to speak with Plaintiff "real quick," and that the Officers did not give her an option or request her specific consent to enter. *Id.* Plaintiff also argues that to the extent there was valid consent, the Officers exceeded the scope of the consent when they entered the home. *Id.* at 7. Plaintiff argues that a reasonable jury could conclude from Kimberly's testimony that she was only interested in having the police help *her* get into her home, and suggests that, at most, Kimberly consented to

15

the Officers entering the garage to talk to Plaintiff. *Id.* Finally, Plaintiff argues that, even if Kimberly consented to the Officers entering, that consent was overridden when Plaintiff met the Officers at the door and objected to their entry. *Id.* at 7–8.

The Court agrees with Defendants that there is no genuine dispute of fact that the Officers had voluntary consent. The consent inquiry is an objective one. In other words, the question is whether the police officers had a reasonable belief that they had consent to enter, even if that belief was mistaken. *See Conner v. Vacek*, No. 17 C 7299, 2019 WL 247535, at *4 (N.D. Ill. Jan. 17, 2019) ("[A] warrantless entry is allowed if a police officer reasonably believes, even if erroneously so, that the person who provided the consent had the authority to do so.") (citing *Rodriguez,* 497 U.S. at 186), *aff'd*, 806 F. App'x 485 (7th Cir. 2020) (unpublished). Whether the Officers' belief was reasonable is measured "based on an objective standard of whether a reasonable police officer would have believed consent was given based on the facts know[n] to the police officer at that time." *Connor*, 2019 WL 247535, at *4 (citing *Rodriguez,* 497 U.S. at 188).

The Court acknowledges there is some factual dispute over whether the Officers expressly asked Kimberly to enter the home itself, that is, to enter the interior door in the garage into the home, but that factual dispute does not carry the day for Plaintiff. While all three Officers testified that Kimberly agreed that they could enter the home, (*see, e.g.*, Dkt. 97-5 at 17:20–18:1; Dkt. 97-6 at 17:15–18:10; Dkt. 97-7 at 19:23–20:20), Plaintiff argues that Kimberly was under the impression the Officers would not enter the home to speak to Plaintiff, but would try to speak to Plaintiff from the garage, or ask him to come outside to speak to them. (Dkt. 102 at 7; Dkt. 100 ¶ 20; Dkt. 97-4 at 55:13–24.)

Even taking the facts in a light most favorable to Plaintiff and crediting Kimberly's testimony about what she believed, it is still, at the very least, undisputed that: (1) the Officers told

Kimberly they wanted to speak to Plaintiff and asked her to try to open the garage door so that they could do so (*see* Dkt. 97-4 at 40:2–41:21); and (2) when Kimberly opened the garage door and the Officers stated that they were going to speak to Plaintiff, Kimberly responded "yeah" or "okay." *Id.* at 41:22–42:19. Kimberly's subjective and unspoken belief that she did not give consent to enter the home (but only the garage) is not dispositive of, or even relevant to, the inquiry. What matters is what a reasonable officer would believe based on these undisputed facts. The Court finds that a reasonable officer would understand from these undisputed facts that Kimberly consented to the Officers entering the house itself to speak with her husband. Specifically, a reasonable officer would understand that, when a person agrees to open a garage door and agrees to allow an officer to speak with another individual who is inside a home, that person is consenting to the officer entering the home itself through the garage to have that conversation. Put another way, it is simply not reasonable to expect that an officer in that moment would have divined that Kimberly was only consenting to the officer entering the garage to try to speak (or even yell through a closed interior door) to Plaintiff, who was in the home, without actually entering the home itself.

Police officers are not mind readers, and are forced to make difficult split-second decisions every day, and the one made here to enter the home was reasonable. Kimberly's subjective belief is simply not consistent with a reasonable officer's belief. Further, there are no facts indicating that her subjective belief manifested in a way such that a reasonable officer in Defendant Officers' positions would think the consent only applied to the garage and not the home itself. *See, e.g.*, *United States v. Funds in the Amount of $830,000 in U.S. Currency*, No. 18 C 01537, 2019 WL 95169, at *5 (N.D. Ill. Jan. 3, 2019) (finding that individuals' consent to search their "bags" provided officers a reasonable belief that they had consent to search all of the individuals' luggage,

because "even if the Claimants subjectively believed that they had only consented to a search of their backpacks, their subjective belief did not manifest itself in a way that would prompt a reasonable officer to think that the consent applied only to the backpacks"). In short, construing all the facts in Plaintiff's favor, the Court finds there is no genuine dispute that a reasonable officer would have understood he had consent to enter the home.

Plaintiff's argument that Defendant Officers exceeded the scope of Kimberly's consent fails for the same reasons. On the undisputed facts discussed above, a reasonable officer would conclude Kimberly consented to him entering the home itself, and the Court finds that no reasonable jury could reach a different conclusion.

As to Plaintiff's argument that a jury could conclude that Kimberly's consent was not voluntarily given, the Court is not persuaded that there are sufficient facts to create a triable issue on voluntariness. "Whether an individual voluntarily consented to a search is a factual assessment that turns on the totality of the circumstances." *United States v. Raibley*, 243 F.3d 1069, 1075 (7th Cir. 2001) (citations omitted). In determining whether a person's consent to enter or search was voluntary, this Court may consider a number of relevant factors, including "(1) the person's age, intelligence, and education, (2) whether [she] was advised of [her] constitutional rights, (3) how long [she] was detained before [she] gave [her] consent, (4) whether [her] consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when [she] gave [her] consent." *Id.* As with the other consent inquiry under the Fourth Amendment above, the factors are viewed based on an objective standard, that is, "whether a reasonable observer would conclude that the person's consent was voluntary." *Funds in the Amount of $830,000*, 2019 WL 95169, at *3, *6.

Plaintiff argues that the fact that Kimberly only agreed to enter the code to open the garage after numerous "demands" from the Officers, who were standing over her, and the fact that she merely responded "yeah" or "okay" to the Officers' statements that they wanted to talk to Plaintiff, create a disputed issue as to whether her consent was voluntary. (Dkt. 102 at 6.) The Court disagrees. As Defendants point out, there are no facts suggesting that Kimberly was deficient in her age, intelligence, or education. While Kimberly was intoxicated, Plaintiff does not suggest this made her unable to provide consent. Further, Kimberly was not being detained and was not in police custody, nor was there any threat that she would be. Rather, the Officers were called by a concerned neighbor in the pre-dawn hours when Kimberly, in distress, sought the neighbors' help; the Officers were present to assist not detain Kimberly. Further, there is no evidence in the record that Kimberly ever rejected the Officers' assistance or requests. It is undisputed that she never told the Officers that they could not enter the home and she never refused to open the garage at any point. While the Officers did not inform Kimberly that she could refuse to comply, this one factor is not dispositive, especially in light of the undisputed facts here. *See, e.g.*, *Dakhlallah v. Zima*, 42 F. Supp. 3d 901, 915 (N.D. Ill. 2014) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.")).

Additionally, the Court finds that the evidence Plaintiff cites does not support his argument that the Officers "demanded" or "told" Plaintiff to open the garage. (Dkt. 102 at 6.) To the contrary, Kimberly testified at different points that the Officers "made the suggestion of the garage," or that they said "maybe you should try" to open the garage, but she never testified that the Officers demanded or affirmatively told her to take any action. (*See* Dkt. 97-4 at 40:11–41:21.) There is evidence the Officers repeated their request that Kimberly try to open the garage,

19

including after Kimberly's first few initial attempts to input the code failed. While repeated requests by law enforcement is a relevant factor for determining whether consent was voluntary, there is no evidence that Kimberly refused to open the garage and only agreed to do so after the Officers made repeated requests. *See id.*; *Raibley*, 243 F.3d at 1075. And again, it is undisputed that at no point did Kimberly say no or suggest she did not want to comply. There is also no suggestion in Kimberly's testimony that the Officers pressured her for a lengthy period of time, used deception or trickery, or exercised any physical coercion. Rather, the Officers told Kimberly they wanted her to open the garage so that they could go and speak with Plaintiff about what had occurred. (Dkt. 97-4 at 38:14–23, 40:4–11, 41:22–24.) While Plaintiff suggests that the Officers "stood over [Kimberly]" while she entered the garage code, the record evidence that Plaintiff cites from Kimberly's deposition testimony does not support this claim, as nowhere in that portion of the testimony does Kimberly indicate the Officers were standing over her or otherwise physically intimidating her or coercing her into opening the door.[6]

Based on all of the above facts, the Court finds there is no genuine dispute of fact that Kimberly's consent was voluntary. The Court acknowledges the "subtle coercion" that can be present when a request comes from law enforcement, which could "make what appears to be a voluntary act an involuntary one." *See United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976). The mere fact that a request comes from law enforcement, however, alone is not enough to establish that consent was involuntary in the absence of any other facts suggesting such consent

---

[6] Plaintiff's statement of additional facts on this point additionally cites Exhibit M, which, as previously noted, is a portion of testimony from Plaintiff's criminal trial from the friend who accompanied the Lietzows that evening. (Dkt. 103 ¶ 20.) Defendants object to the use of this testimony, but even if the Court accepts the evidence, it does not help Plaintiff's claim here. The particular excerpt Plaintiff cites merely indicates that the friend testified that Kimberly tried to open the garage "two or three times" before it opened. (Dkt. 101-1 at 25.) The testimony does not suggest that the Officers "stood over" Kimberly or pressured her in any way. Insofar as other evidence may support this fact, it is not the Court's responsibility to go hunting for it in the record beyond what Plaintiff has cited to. *See Thornton*, 796 F.3d at 769.

was coerced. *See, e.g.*, *Dakhlallah*, 42 F. Supp. 3d at 915 (recognizing the court must be mindful of "subtle coercion" from law enforcement, but ruling on summary judgment that consent for search was voluntary, where there were no facts suggesting the person who gave consent felt forced or coerced, or that the officers threatened him or used any deception or trickery). In the circumstances presented here, the Court does not find that the mere fact that the request to open the garage came from law enforcement and was repeated several times is enough to create a triable issue on whether consent was voluntary, given the absence of any evidence suggesting Kimberly lacked capacity to give voluntary consent, and the absence of any evidence suggesting Kimberly was coerced or misled by Officers, who were called to assist her.

Finally, the Court addresses Plaintiff's argument that, even if Kimberly provided consent, that consent was overridden when Plaintiff objected to the Officers' entry into his home. Plaintiff relies on *Georgia v. Randolph,* 547 U.S. 103, 123 (2006). In that case, police responded to a domestic violence incident where a wife alleged that her estranged husband had taken their child away from the home and had a drug problem, and that there was evidence of drug use in the house. *Id.* at 107. The police initially asked the husband for permission to search the house, which he unequivocally refused. *Id.* The police then turned to the wife and asked for consent, which she gave. *Id.* The Supreme Court held that, while a co-tenant generally has the right to consent to a search of a property, that consent alone is not enough to override an express refusal from the other tenant if he is physically present and the search relates to him. *Id.* at 121–23 ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."). Plaintiff argues *Randolph* "is on all fours" with this case, and therefore Plaintiff's objection to the Officers entering his home overrode any consent from Kimberly. (Dkt. 102 at 8.)

But the Court finds *Randolph* distinguishable and even supportive of Defendants' position. As Defendants note, while in *Randolph* the officers first asked the husband, who refused, only to then get consent from the co-tenant wife, here the Officers went to Kimberly first when Plaintiff did not answer the door, and Kimberly gave consent before any refusal by Plaintiff. (Dkt. 104 at 8; Dkt. 100 ¶¶ 19–20.) While Plaintiff was in the home, unlike the husband in *Randolph*, he did not answer the door, nor did he talk to the Officers and initially refuse consent. The Court in *Randolph* addressed this distinction, noting the "fine line" they were drawing for when an objecting tenant can override another tenant's consent: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, *nearby but not invited to take part in the threshold colloquy, loses out*." *Randolph*, 547 U.S. at 121 (emphasis added). The facts here fit the latter situation: Plaintiff was "nearby" in the home but was not part of the "threshold colloquy" between the Officers and Kimberly because he refused to answer the door, and so Kimberly provided consent. Therefore Plaintiff, as the Court put it in *Randolph*, "loses out" to Kimberly's consent.

To the extent that Plaintiff points to his "objection" when the Officers began to enter the interior door to the home, the Court finds that this objection does not bring the case under the auspices of *Randolph*. There, the husband and wife were both standing at the threshold together, and after the husband refused, the officers turned to the wife for consent. *See id.* at 107; *see also United States v. Reed*, 539 F.3d 595, 598 (7th Cir. 2008) (discussing *Randolph* and its holding). Here, the Officers had already received valid consent, had entered the garage, and were entering through the interior door into the home when Plaintiff claims he objected. While it is disputed how far Officers got through the interior door before Plaintiff tried to hold the door closed and the

struggle began, the search or entry to which Kimberly had consented had, for all intents and purposes, already taken place. In other words, Plaintiff's objection cannot be said to have overridden the Officers' consent to enter where they had, in effect, already entered by going into the garage and beginning to open and go through the interior door. The objection came too late. *See Hays v. Bolton*, 488 F. App'x 971, 977 (6th Cir. 2012) (unpublished) ("*Randolph* limits, clearly and succinctly, an objecting co-tenant's ability to vitiate the previously given consent of his co-tenant to situations where the objecting co-tenant voices his complaint *before the search or entry has taken place*.") (emphasis added). The Court thus finds *Randolph* does not control the outcome here and Plaintiff's objection did not override Kimberly's prior consent.

The Court additionally notes that, even if it stopped short of finding that Plaintiff's objection did not override Kimberly's prior consent, it would still find summary judgment was warranted on this claim on the grounds of qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). Thus, qualified immunity would protect Defendant Officers here if a reasonable officer would have believed that the officers' entry into Plaintiff's home was constitutional. *See Wonsey*, 940 F.3d at 400. Here, it is not clearly established now, nor was it in 2017 when the incident occurred, that Plaintiff's objection at the interior doorway, after the Officers were already in the garage and opening and entering the interior door, revoked Kimberly's consent to enter and rendered the entry unreasonable under the Fourth Amendment. *See generally Childers v. City of Hobbs*, No. 1:21-CV-0056 RB/GBW, 2022 WL 3586251 (D.N.M. Aug. 22, 2022) (reviewing *Randolph* and related caselaw, and concluding qualified immunity applied because it was not "clearly established" that an officer violated the plaintiff's rights, where the plaintiff objected to the officer searching his

23

bedroom, but did so only after the officer had already entered the room based on a roommate's consent).

On the issue of qualified immunity, Plaintiff cites *Randolph*, and repeats his claim that the circumstances are "identical." (Dkt. 102 at 13–14.) But *Randolph* is distinguishable as discussed above, and it does not apply in circumstances like those here, where the co-tenant's objection comes after prior consent was obtained and officers have already begun to enter. Absent any clear authority applicable to the circumstances here, the Court finds that a reasonable officer would have concluded it was constitutional to enter the interior door based on Kimberly's prior consent, notwithstanding Plaintiff's objection as the door was being opened.

In sum, as there is no genuine dispute of fact that the Officers had consent to enter Plaintiff's home, the Court finds that Defendant Officers are entitled to summary judgment in their favor on Plaintiff's claim for illegal search and seizure.

### B. Counts I and II: False Arrest and Illegal Pretrial Detention

In Counts I and II, Plaintiff brings claims against Defendant Officers under the Fourth Amendment for false arrest and illegal pretrial detention, based on Plaintiff's arrest and detention for aggravated domestic battery, aggravated battery of a peace officer, domestic battery, and resisting arrest. Defendants move for summary judgment on both claims, arguing that there was probable cause for Plaintiff's arrest and detention. (Dkt. 96 at 5–6.)

In general, "probable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention." *Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) (unpublished) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015)); *see also Lindsey v. Macias*, 907 F.3d 517, 521 n.4 (7th Cir. 2018) ("Probable cause to arrest is an absolute defense to any § 1983 claim for wrongful

arrest, false imprisonment, or malicious prosecution."). "Police officers have probable cause to arrest when the totality of the facts and circumstances within their knowledge at the time of the arrest would warrant a reasonable person in believing the person has committed a crime." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015); *see also Idris v. Conway*, No. 12 C 6271, 2014 WL 4244222, at *6 (N.D. Ill. Aug. 27, 2014) ("The test is an objective one and evaluates whether probable cause existed on the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect.") (citation omitted). Further, "[p]robable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Holmes v. Vill. of Hoffman Ests.*, 511 F.3d 673, 682 (7th Cir. 2007).

### 1. Probable cause to arrest

Defendants point to what they contend are the undisputed facts known to the Officers at the time of arrest, which they maintain establish probable cause to arrest Plaintiff. Specifically, Defendants note that: (1) a 911 call was made by a neighbor on behalf of a victim, Kimberly, during which the caller reported that an individual, later identified as Plaintiff, had tried to "choke" or "strangle" Kimberly; (2) when the Officers arrived Kimberly was visibly upset; and (3) Kimberly told the Officers that Plaintiff tried to choke her. (Dkt. 96 at 7–8.) Defendants note that the statement of a "reasonably credible witness," on its own, may provide an officer with probable cause. *Id.* at 6; *see also Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) ("Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect."). Defendants argue that, based on these facts known to the Officers, a reasonable person would believe Plaintiff had committed a crime. *Id.* at 8.

In response, Plaintiff argues that the facts on which Defendants rely are either in dispute or

not sufficient. Regarding the 911 call, Plaintiff notes that Ms. Beam's statement to the dispatcher was not an *eyewitness* account, and further argues that Ms. Beam merely said "she believed" Kimberly was choked, and there was no evidence on the call that Kimberly herself claimed to be choked or strangled in any way. (Dkt. 102 at 10–11.) Instead, Plaintiff suggests that the Beams reached that conclusion simply because Kimberly was "holding her throat." *Id.* Plaintiff also suggests that whatever information Defendant Officers had from the dispatch call "dissipated" when they interviewed Kimberly, "who denied the Plaintiff battered her." *Id.* at 11. Plaintiff further notes that the Officers admitted they saw no injuries on her, and again claims that it is disputed that Kimberly told Officer Daley that Plaintiff choked her. *Id.*

Under Illinois law, a person commits domestic battery when they knowingly, and without legal justification, make physical contact of an insulting or provoking nature with any family or household member. 720 ILCS 5/12-3.2. A person commits aggravated domestic battery when, in committing a domestic battery, a person "strangles" another individual, meaning they intentionally impede the normal breathing of that individual. 720 ILCS 5/12-3.3. Based on the undisputed facts, the Court agrees with Defendants that the Officers had probable cause to arrest Plaintiff for both of these crimes. Although Plaintiff goes to great lengths to suggest the existence of genuine disputes of material fact, the record evidence he cites does not support his claims.

First, it is irrefutable on the audio recording of the 911 tape that Ms. Beam relayed to 911 that Plaintiff tried to choke Kimberly. (Dkt. 97-8 at approx. 1:55, 3:08.) While Plaintiff is correct that Ms. Beam initially qualified the statement by saying "I believe" Plaintiff tried to strangle her, later, with Kimberly in the background, Ms. Beam repeated her statement that "he tried to choke her." *Id.* Thus, regardless of whether Kimberly actually told the Beams the attack had happened, which Kimberly denied in her deposition, and regardless of why Ms. Beam told dispatch "he tried

to choke her," the fact is she did. And that statement, that Plaintiff tried to strangle Kimberly, was relayed to the Officers by the 911 dispatcher. (Dkt. 97-9 at approx. 1:16.) Recall that the probable cause inquiry is objective and based on the facts as they appear to a reasonable officer at the time, even if the officer's reasonable belief later proves to be incorrect. Thus, while Kimberly and Plaintiff now deny that any domestic violence incident occurred and deny that Kimberly told the Beams she had been attacked, the facts that were known to the Officers, based on Ms. Beam's 911 call alone, were that Plaintiff had tried to choke Kimberly.

Second, while Plaintiff repeatedly disputes that Kimberly told the Officers that Plaintiff had tried to choke her, and goes so far in his briefing as to suggest that Kimberly "denied" that Plaintiff battered her, the cited record evidence does not support Plaintiff's assertions. In disputing Defendants' claim that Kimberly told Officer Daley that Plaintiff choked her, Plaintiff cites a short portion of Kimberly's deposition transcript in which she testified that she did not know Ms. Beam told the 911 operator that Plaintiff tried to choke her, and that she never told the Beams that Plaintiff had tried to strangle or choke her. (Dkt. 100 ¶ 17.) But even accepting that what Kimberly told the Beams is in dispute, Kimberly's testimony about what she told the Beams before they called 911 does not contradict the testimony by Officers Daley and Panvino that Kimberly later told them that Plaintiff had put his hands around her neck and tied to choke her. (Dkt. 97-5 at 12:4–13:5; Dkt. 97-6 at 16:9–17:4.) Indeed, while Plaintiff states that the fact is disputed and cites Kimberly's testimony, he offers no explanation for why the cited testimony controverts what Kimberly told the Officers. Under the local rules, it is not enough to claim a fact is disputed and provide a citation to record evidence; a party must also "concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). Absent any explanation, the Court finds that Plaintiff's cited evidence is insufficient to create a genuine dispute of fact as to what Kimberly

told the Officers had happened. Accordingly, the testimony by Officers Daley and Panvino that Kimberly told them that Plaintiff had put his hands around her neck and tried to choke her is undisputed.

Plaintiff's record citations in his statement of additional facts also do not contradict the Officers' testimony that Kimberly told them her husband tried to choke her. Plaintiff states that Kimberly did not tell Defendant Officers she was choked or physically harmed, and cites three portions of Kimberly's deposition testimony for support. (Dkt. 101 ¶ 17.) One excerpt is the testimony related to what Kimberly told the Beams discussed above, which again, does not support one way or another what Kimberly told the Officers. As to the other two excerpts, neither portion of the deposition testimony relates to whether Kimberly told the Officers she was choked. In one excerpt, Kimberly testified that one of the Officers asked her "something about . . . getting into the house" and asked if she had tried all the doors. (Dkt. 101 ¶ 17; Dkt. 97-4 at 33:1–4.) In the other excerpt, Kimberly testified that one of the Officers said he did not see any injuries on Kimberly. (Dkt. 101 ¶¶ 17–18; Dkt 97-4 at 38:12–13.) But these brief excerpts of testimony about other exchanges between Kimberly and the Officers do not contradict Defendants' claim that Kimberly *also* told the Officers she was choked. As far as the Court can tell from Kimberly's deposition transcript, while she denies that any domestic violence incident occurred, she was neither asked nor did she expressly state whether she told any of the Officers she was attacked. Insofar as there is other evidence that may contradict the Officers' claims, Plaintiff has not cited to it in the record.[7]

At this stage, while the Court must construe all facts in Plaintiff's favor, the Court

---

[7] In Plaintiff's statement of additional facts claiming Kimberly did not tell the Officers she was choked or harmed, Plaintiff additionally cites a "Trial Trans." but does not provide any exhibit number, and it is unclear from the pin citation he provides, "10-5-16, 25:13-16," what exactly Plaintiff is referring to. The trial transcripts at Exhibits M and N are from Plaintiff's trial on October 5, 2016, but the testimony is from the friend who was with the Lietzows that night, and from Officer Daley, and it only runs from pages 192–212 and 117–163. The testimony therefore does not include the portion at "25:13-16," which Plaintiff cites. Again, it is not the Court's job to scour the record looking for factual disputes in the absence of a clear citation to a portion of the record before it.

ultimately does not find that the Lietzows' denial that any domestic violence incident occurred, and denial about what Kimberly told the Beams, is enough to create a genuine dispute as to what Kimberly told Officer Daley (*i.e.*, that her husband tried to choke her). Thus, taking all the facts known to the Officers, including Ms. Beam's statements to 911 which were reported to the Officers by dispatch, Kimberly's statements to the Officers which were not properly disputed, and the fact that Kimberly was holding her throat, coughing, and had difficulty breathing while talking to the Officers, the Court finds that a reasonable person would believe Plaintiff had strangled or choked Kimberly, committing the crimes of domestic battery and aggravated domestic battery. *See* 720 ILCS 5/12-3.2, 5/12-3.3. The Officers thus had probable cause to arrest Plaintiff.[8]

That the Officers had probable cause to arrest Plaintiff for domestic battery and aggravated domestic battery is an absolute defense to Plaintiff's false arrest claim in its entirety, regardless of the other charges (resisting arrest and battery of a police officer) he may also have been charged with. *See Holmes*, 511 F.3d at 682 ("[P]robable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."). The Court thus need not resolve the question of whether the Officers also had probable cause to arrest Plaintiff for resisting arrest and battery of a police officer. The existence of probable cause also necessarily defeats any failure-to-intervene

---

[8] Even if the Court were to accept Plaintiff's argument that there are enough facts to create a dispute as to what was told to the Officers, the Court would still find summary judgment appropriate on this claim on the basis of qualified immunity. Setting aside whether Kimberly affirmatively told Officers she was choked, which alone would be enough for probable cause, the other facts known to the Officers would, at the very least, support "arguable" probable cause. *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018) ("Qualified immunity is available if there is 'arguable probable cause' for the arrest."); *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 718 (7th Cir. 2013) (explaining that "qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists"). Here the Officers were told, without any equivocation, that a victim, Kimberly, had her neighbor call 911 because she had been choked by her husband. When Officers interviewed Kimberly, she was upset, talking with a raspy voice, and having difficulty breathing. Whether Kimberly affirmatively stated Plaintiff had choked her at this point or wanted to file a criminal complaint, there is no evidence that she denied the incident had occurred *at the time*. The Court would thus find the Officers had arguable probable cause to arrest Plaintiff on these facts and would be entitled to qualified immunity, irrespective of whether Kimberly expressly told Officer Daley Plaintiff had attacked her.

claim. *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Judgment is therefore appropriate in Defendants' favor on Count I in its entirety.

### 2. *Probable cause to detain*

The existence of probable cause to arrest Plaintiff for aggravated domestic battery is also an absolute bar to Plaintiff's illegal pretrial detention claims under Count II. *See Norris*, 761 F. App'x at 615; *see also Haynes v. City of Chicago*, No. 21 C 4643, 2022 WL 1016392, at *2 (N.D. Ill. Apr. 5, 2022) ("The existence of probable cause defeats an unlawful detention claim.") (citing *Holmes*, 511 F.3d at 679–80).

Plaintiff claims that Defendants have improperly failed to distinguish between probable cause to arrest and probable cause to detain or prosecute. (Dkt. 102 at 12.) Plaintiff relies on the Seventh Circuit's decision in *Holmes* to argue that each of the separate torts of false arrest, illegal pretrial detention, and malicious prosecution "analyze probable cause in a charge-specific manner." (Dkt. 102 at 12) (citations omitted). Therefore, according to Plaintiff, while probable cause to arrest him for one charge, such as domestic battery, may defeat his detention and malicious prosecution claims on that same charge, the same is not true for his detention and prosecution claims based on other charges, such as the resisting arrest and battery-of-an-officer claims, where probable cause must be assessed independently.

Plaintiff is correct that for his malicious prosecution claim, probable cause must be analyzed separately with respect to each charge for which he was prosecuted. In *Holmes*, the Seventh Circuit explained that a state law malicious prosecution claim is "treated differently" from one for false arrest, and it therefore held that "probable cause to believe an individual committed one crime—and even his conviction of that crime—does not foreclose *a malicious prosecution claim* for additionally prosecuting the individual on a separate charge." *Holmes*, 511 F.3d at 682

(emphasis added). In other words, where probable cause to believe a person committed "any crime" will preclude a false arrest claim even if the person is arrested on additional or different charges for which there was no probable cause, the same is not true for a state law malicious prosecution claim. *Id.* Plaintiff is therefore correct that the mere fact that the Officers here had probable cause to arrest him for aggravated domestic battery will not, on its own, defeat his separate state law malicious prosecution claims based on his prosecution for resisting arrest and battery of a police officer.

But *Holmes*' instruction on the independent, charge-specific analysis of a malicious prosecution claim does not save Plaintiff's illegal pretrial detention claim. *Holmes* focused on the distinction between an arrest and a prosecution in particular, noting that "an arrested individual is no more seized when he is arrested on three grounds rather than one . . . so long as there is a reasonable basis for the arrest." *Id.* On the other hand, the court observed that, "when it comes to prosecution, the number and nature of the charges matters: the accused must investigate and prepare a defense to each charge, and as the list of charges lengthens (along with the sentence to which the accused is exposed), the cost and psychic toll of the prosecution on the accused increase." *Id.* This arrest/prosecution distinction supported the holding that probable cause to arrest for one crime, while it will totally foreclose a false arrest claim, will not foreclose a state malicious prosecution claim for another.

*Holmes*, however, did not extend this logic to pretrial detention claims. *See Urbanski v. City of Chicago*, No. 09-CV-280, 2011 WL 1103886, at *6 (N.D. Ill. Mar. 25, 2011) ("*Holmes* did not recognize a federal, constitutional claim based on allegations of wrongful detention. Rather, *Holmes* simply held that probable cause supporting a criminal charge for one crime does not foreclose a state-law malicious prosecution claim as to one or more additional charges for which

the defendant is later prosecuted."). Nor has the Seventh Circuit ever extended the reasoning in *Holmes* to suggest that probable cause in the context of pretrial detention claims is "charge-specific" in the same way it is for malicious prosecution claims. And there is good reason to think it would not be extended in that manner. Just as the *Holmes* court observed that "an arrested individual is no more seized when he is arrested on three grounds rather than one," an individual is no more seized when he is detained on two or three grounds rather than one. Thus, probable cause to detain an individual on one charge defeats a § 1983 claim for illegal pretrial detention regardless of whether there is probable cause for any additional charges. *See Urbanski*, 2011 WL 1103886 at *6 (granting summary judgment to defendants on false imprisonment claims because officers had probable cause to arrest and detain plaintiff on one charge, regardless of probable cause to detain on other charges); *Banister v. City of Chicago*, No. 06 CV 5759, 2009 WL 2948396, at *4 (N.D. Ill. Sept. 10, 2009) (same); *see also Haynes v. City of Chicago*, No. 21 C 4643, 2022 WL 1016392, at *3 (N.D. Ill. Apr. 5, 2022) (that officers had probable cause to arrest the plaintiff for driving with a suspended license defeated his unlawful pretrial detention claims, regardless of the fact that plaintiff was detained on other charges that were ultimately dismissed).[9]

---

[9] Plaintiff cites one other case from this District that he maintains supports his contention that pretrial detention claims are "charge-specific." (Dkt. 102 at 12) (citing *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 WL 1382101, at *4 n.5 (N.D. Ill. Mar. 27, 2019) ("[I]t cannot be the case that a person's constitutional rights are not violated when the government uses false evidence to detain and convict a person of murder, as long as the person committed any other crime that would justify the detention."). But the court there did not address this precise question of whether, when there is probable cause to detain an individual on one charge, probable cause to detain for any additional charges must be assessed independently. The court in *Roldan* found that defendants had not identified any facts known to the officers that would have justified the arrest and detention of the plaintiff at the time he was arrested. *Id.* at *4. Therefore, the fact that the plaintiff later admitted he committed a crime was not enough to warrant dismissal of his Fourth Amendment false arrest and wrongful detention claim where there was allegedly no probable cause at the time of his arrest. *Id.* Thus, at most, the case suggests that a later *confession* of one crime will not justify an earlier detention without probable cause. Here, there was probable cause at the time of the arrest and detention, thus the reasoning of *Roldan* is inapplicable. Plaintiff also cites to a decision from the Eastern District of New York which he maintains also held that pre-trial detention claims are charge specific. *Daniels v. Gladstone*, No. 16-CV-190, 2019 WL 3502924, at *9–10 (E.D.N.Y. July 31, 2019). But there the court merely noted that in the Second Circuit, as in the Seventh, *malicious prosecution* claims are charge-specific, and it said nothing about whether pretrial detention claims are treated in the same charge-specific manner. *Id.* The case is thus of no help to Plaintiff.

In short, given there was probable cause to detain Plaintiff on at least the domestic battery and aggravated domestic battery charges, the Court finds that summary judgment is proper on the illegal pretrial detention claim as a whole, irrespective of whether there was separate probable cause for the other charges of resisting arrest and battery of a police officer, because again, there was no independent seizure by detaining plaintiff for those additional charges. Therefore, judgment in Defendants' favor on Plaintiff's false arrest (Count I) and pretrial detention claims (Count II) is warranted.

### C. Remaining state law claims

This leaves Plaintiff's state law claims for malicious prosecution (Count III) and indemnification against the Village (Count V). First, as explained above, the fact that the Officers had probable cause as a matter of law to arrest Plaintiff for domestic battery and aggravated domestic battery forecloses any state law malicious prosecution claim, and any indemnification claim, based on those charges. *See Lindsey*, 907 F.3d at 521 n.4; *see also, e.g.*, *Casciaro v. Von Allmen*, No. 17 CV 50094, 2018 WL 4030583, at *13 (N.D. Ill. Aug. 23, 2018) (noting there can be no claim for indemnification when the underlying actions fail). However, the existence of probable cause for those two charges does not, on its own, defeat a malicious prosecution claim on the independent charges of resisting arrest and battery of a police officer. *See Holmes,* 511 F.3d at 682.

But that does not mean those state claims should proceed in this Court. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010); *Groce v. Eli Lilly & Co*., 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to

dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). The Seventh Circuit has identified certain limited circumstances that may "displace the presumption" of the return of pendant state law claims to state court, including whether the statute of limitations on the claims has run, whether substantial judicial resources have already been committed, or where it is "absolutely clear" how the pendent claims can be decided. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc*., 672 F.3d 476, 480 (7th Cir. 2012) (citations omitted). Plaintiff argues that the Court should exercise its supplemental jurisdiction because the case is ready for trial and sending any remaining claims back to state court would needlessly delay a trial. (Dkt. 102 at 14.)

The Court does not find the circumstances here warrant any departure from the presumption that the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. There is no statute of limitations issue, nor is it "absolutely clear" how the Illinois state courts would resolve the malicious prosecution claims, given there was probable cause to arrest and detain Plaintiff for other charges. And while this case has gone through discovery and only trial remains, the Court does not find that substantial resources have been expended such that the Court should depart from the default rule that it return the remaining state law claims to state court.

Therefore, insofar as Plaintiff's state law claims for malicious prosecution for resisting arrest and battery of a police officer, and indemnification based on those claims, survive, the Court declines to exercise its supplemental jurisdiction. Those claims are therefore dismissed without prejudice.

**Conclusion**

For all the foregoing reasons, Defendants' motion for summary judgment is granted. The Court enters judgment in Defendants' favor as to Plaintiff's claims for false arrest (Count I), illegal pretrial detention (Count II), and illegal search and seizure (Count IV). As to the remaining state law claims for malicious prosecution (Count III) for the charges of resisting arrest and battery of a police officer, and indemnification against the Village (Count V), the Court declines to exercise supplemental jurisdiction over these claims. Those remaining claims are therefore dismissed without prejudice to Plaintiff refiling in state court.

ENTERED: 4/14/2023

_Nancy L. Maldonado_
_____
Nancy L. Maldonado
United States District Court Judge